UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| BRIDGIT L. HEATH, )<br>)<br>    *Plaintiff* )<br>)<br>v. )<br>)<br>MICHAEL J. ASTRUE, )<br>**Commissioner of Social Security,** )<br>)<br>    *Defendant* ) | No. 1:12-cv-99-DBH |

### REPORT AND RECOMMENDED DECISION[1]

This Social Security Disability ("SSD") and Supplemental Security Income ("SSI") appeal raises the question of whether the administrative law judge supportably found the plaintiff capable of performing work existing in significant numbers in the national economy. The plaintiff seeks reversal and remand on the grounds that the administrative law judge (i) failed to reflect, in his determination of her residual functional capacity ("RFC"), her significant hearing impairment or her documented mental health issues, (ii) improperly rejected the opinion of longtime treating psychiatrist Jennifer Parent, M.D., and (iii) erroneously relied, at Step 5, on Social Security Ruling 96-9p ("SSR 96-9p") and on section 204.00 of the so-called "Grid," Appendix 2 to Subpart P, 20 C.F.R. § 404, to reach the conclusion that she was not disabled. *See* Itemized Statement of Specific Errors ("Statement of Errors") (ECF No. 11) at 4-11. I agree

---

[1] This action is properly brought under 42 U.S.C. §§ 405(g) and 1383(c)(3). The commissioner has admitted that the plaintiff has exhausted her administrative remedies. The case is presented as a request for judicial review by this court pursuant to Local Rule 16.3(a)(2)(A), which requires the plaintiff to file an itemized statement of the specific errors upon which she seeks reversal of the commissioner's decision and to complete and file a fact sheet available at the Clerk's Office. Oral argument was held before me on December 12, 2012, pursuant to Local Rule 16.3(a)(2)(C), requiring the parties to set forth at oral argument their respective positions with citations to relevant statutes, regulations, case authority, and page references to the administrative record.

with the plaintiff that the administrative law judge committed reversible error in his treatment of her hearing impairment. On that basis, I recommend that the court reverse the commissioner's decision and remand this case for further proceedings consistent herewith.

Pursuant to the commissioner's sequential evaluation process, 20 C.F.R. §§ 404.1520, 416.920; *Goodermote v. Secretary of Health & Human Servs.*, 690 F.2d 5, 6 (1st Cir. 1982), the administrative law judge found, in relevant part, that the plaintiff had severe impairments of hearing loss, mood disorder, and attention deficit hyperactivity disorder ("ADHD"), Finding 3, Record at 19; that she retained the RFC to perform a full range of work at all exertional levels and to perform the basic mental demands of work, in that she could hear, understand, remember, and carry out simple instructions, could use judgment in making simple work-related decisions, could respond appropriately to co-workers and supervisors and usual work situations, and could adapt to changes in the ordinary work setting, Finding 5, *id*. at 21;[2] that, considering her age (23 years old, defined as a younger individual, on her alleged disability onset date), education (at least high school), work experience (transferability of job skills immaterial), and RFC, there were jobs existing in significant numbers in the national economy that she could perform, Findings 7-10, *id*. at 24; and that she, therefore, was not disabled from August 16, 2007, her alleged disability onset date, through August 2, 2011, the date of the decision, Finding 11, *id*. at

---

[2] "Exertional capacity addresses an individual's limitations and restrictions of physical strength and defines the individual's remaining ability to perform each of seven strength demands: Sitting, standing, walking, lifting, carrying, pushing, and pulling." SSR 96-9p, reprinted in *West's Social Security Reporting Service* Rulings 1983-1991 (Supp. 2012), at 156. "Nonexertional capacity considers any work-related limitations and restrictions that are not exertional." *Id*. "Therefore, a nonexertional limitation is an impairment-caused limitation affecting such capacities as mental abilities, vision, hearing, speech, climbing, balancing, stooping, kneeling, crouching, crawling, reaching, handling, fingering, and feeling." *Id*.

25.[3] The Appeals Council declined to review the decision, *id*. at 1-3, making the decision the final determination of the commissioner, 20 C.F.R. §§ 404.981, 416.1481; *Dupuis v. Secretary of Health & Human Servs.*, 869 F.2d 622, 623 (1st Cir. 1989).

The standard of review of the commissioner's decision is whether the determination made is supported by substantial evidence. 42 U.S.C. §§ 405(g), 1383(c)(3); *Manso-Pizarro v. Secretary of Health & Human Servs.*, 76 F.3d 15, 16 (1st Cir. 1996). In other words, the determination must be supported by such relevant evidence as a reasonable mind might accept as adequate to support the conclusion drawn. *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *Rodriguez v. Secretary of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981).

The administrative law judge reached Step 5 of the sequential evaluation process, at which stage the burden of proof shifts to the commissioner to show that a claimant can perform work other than her past relevant work. 20 C.F.R. §§ 404.1520(g), 416.920(g); *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Goodermote*, 690 F.2d at 7. The record must contain substantial evidence in support of the commissioner's findings regarding the plaintiff's RFC to perform such other work. *Rosado v. Secretary of Health & Human Servs.*, 807 F.2d 292, 294 (1st Cir. 1986).

## I. Discussion

The plaintiff's first and third points of error implicate the administrative law judge's handling of the impact of her hearing loss; all three of her points of error implicate his handling of the impact of her mental health impairments. *See* Statement of Errors at 4-11. For the reasons

---

[3] The plaintiff was insured, for purposes of SSD benefits, through June 30, 2011. *See* Finding 1, Record at 19.

discussed below, I recommend that the court find that the administrative law judge committed reversible error in his treatment of the plaintiff's hearing loss but not in his handling of her mental impairments.

### A.  Hearing Loss

When the plaintiff applied for Social Security benefits, an intake worker observed that she wore hearing aids in both ears "and had difficulty understanding some of the questions." Record at 200.  The intake worker noted that the plaintiff "attended the interview with her case manager[,] who helped with explanations of some of the questions."  *Id*.

The plaintiff underwent audiological testing on August 13, 2009, which documented "a moderate to severe sensorineural hearing loss with a cookie bite configuration bilaterally with thresholds poorer below 2000 Hz."  *Id*. at 479.  The plaintiff had a fair word recognition score for her right ear (60 percent) and good for her left ear (80 percent).  *See id*.  Examiners noted that she "would be unable to hear and distinguish speech at normal conversational levels due to the severity of her hearing loss[,]" although her own speech was "very intelligible, likely due to the fact that she has had hearing aids for the majority of her life."  *Id*.

Two Disability Determination Services ("DDS") nonexamining consultants, Donald Trumbull, M.D., in a report dated August 31, 2009, and Richard T. Chamberlin, M.D., in a report dated February 2, 2010, both found that the plaintiff had a severe impairment of hearing loss. *See id*. at 485, 619.  Both expressed agreement with the findings of the August 13, 2009, audiological report.  *See id*. at 486, 620.  Dr. Trumbull further noted that the plaintiff needed to use hearing aids, avoid high background noise, use hearing protection, required visual/tactile

4

safety warning, and needed to avoid all areas in which normal binaural hearing was necessary for safety. *See id*. at 484.[4]

The plaintiff testified that she had been afflicted with hearing difficulty since she was two years old, that she wore hearing aids in both ears, and that she did not "hear much[,]" although she could hear people one on one: "I can hear them. As long as they are facing me I can read lips. But if there are other people in the room then I can't hear it at all." *Id*. at 37. She testified that, when working as a bagger at a grocery store, she had a hard time hearing customers and tried to avoid them. *See id*. at 38. She further testified that she attempted to work in the deli but did not like it because she could not hear people. *See id*. She listed, as among reasons that she could not work, that she had "a hard time hearing people most of the time so I get frustrated on that." *Id*. at 48.

At hearing, the administrative law judge asked the plaintiff's counsel whether his client retained the ability to hear and understand simple oral instructions and communicate simple information. *See id*. at 39. The plaintiff's counsel responded: "I think in most office-type environments where there is not a lot of noise[,] that . . . would be fine." *Id*. The administrative law judge commented:

> And that would be consistent with Social Security Ruling 96[-9p]. [I]t says, "Sedentary occupational base is not significant[ly] eroded where the claimant has the ability to hear and understand oral instructions or to communicate simple information."

*Id*. The relevant passage from SSR 96-9p states, in its entirety:

---

[4] Dr. Chamberlin checked a box indicating that the plaintiff had no communicative limitations. *See* Record at 618. This presumably was error: he elsewhere stated that the plaintiff had a severe impairment of "a well documented chronic hearing loss[,]" *id*. at 619, and endorsed the audiological testing findings, *see id*. at 620. In any event, nothing turns on the lack of a notation by Dr. Chamberlin of communicative limitations. The administrative law judge stated that he gave great weight not only to the Chamberlin RFC opinion but also that of Dr. Trumbull, *see id*. at 24, who did describe communicative limitations, *see id*. at 484.

5

> Communicative limitations: Basic communication is all that is needed to do unskilled work. The ability to hear and understand simple oral instructions or to communicate simple information is sufficient. If the individual retains these basic communication abilities, the unskilled sedentary occupational base would not be significantly eroded in these areas.

SSR 96-9p, *reprinted in West's Social Security Reporting Service,* Rulings 1983-1991 (Supp. 2012), at 160.

At hearing, the administrative law judge also asked psychologist Charles Tingley, Ph.D. (erroneously referred to in the hearing transcript as "Dr. Kingley"), whether the plaintiff could respond appropriately to co-workers and supervisors in usual work situations. *See* Record at 54. Dr. Tingley testified that some accommodation would need to be made because of the plaintiff's hearing impairment and the likelihood that she would either not hear or misunderstand communication. *See id*. at 54-55. He agreed with the administrative law judge that, pursuant to SSR 96-9p, that accommodation could take the form of a limitation to sedentary work. *See id*. at 55. However, on cross-examination, when asked by the plaintiff's counsel whether there would be times that the plaintiff would have difficulty understanding or comprehending what she was being told, Dr. Tingley stated that he believed so, "related to what she's reported to be an outgrowth of her hearing disorder." *Id*.

The administrative law judge stated that he would not give weight to Dr. Tingley's testimony regarding accommodations for hearing loss because it conflicted with SSR 96-9p. *See id*. at 57.

At hearing, the administrative law judge asked vocational expert Peter V. Mazzaro whether the sedentary unskilled occupational base would be significantly eroded for a hypothetical individual with no physical limitations other than hearing loss when the individual could hear and understand simple oral instructions and communicate simple instructions, was

limited to sedentary work, and could understand, remember, and carry out simple instructions, use judgment in making simple work-related decisions, respond appropriately to co-workers, supervisors and usual work situations, and adapt to changes in an ordinary work setting. *See id*. at 58-59. Mazzaro testified that it would be, because sedentary work "requires hearing, it requires the ability to communicate more than just simply, hearing more than just simply, – suffice it to say there would be a significant erosion, not a total erosion, based on that." *Id*. at 59. Mazzaro further explained:

> What we're looking at in sedentary work is Addressors, Surveillance System Monitor, Loader Semi-conductor Dyes, Information Clerk, Charge Account Clerk. Those kinds of jobs require good hearing and the ability to communicate. Well, I guess that's it. You can't do the job if you can't do the job.

*Id*. at 59-60.

In his decision, the administrative law judge found that the plaintiff retained the capacity, *inter alia*, to hear, understand, remember, and carry out simple instructions and respond appropriately to co-workers and supervisors and usual work situations. *See* Finding 5, *id*. at 21. He explained:

> The evidence . . . fails to support a conclusion that the [plaintiff's] bilateral hearing loss would preclude the performance of substantial gainful activity. Audiological testing done in August 2009 indicated that her word recognition ability was "fair" in her left ear and "good" in her right. Her own speech was "very intelligible." She was found to be unable to hear/distinguish speech at normal conversational levels. However, with the use of hearing aids and her proficiency at lip reading, the [plaintiff] is able to communicate effectively within the limitations described above. Treating sources have not described significant problems communicating with the [plaintiff], and she was able to participate in the hearing without noticeable difficulty.

*Id*. at 23-24 (citation omitted). He stated that he accorded great weight to the findings of Drs. Trumbull and Chamberlin that the plaintiff had no exertional limitations and that her only physical impairment was her well-documented hearing loss. *See id*. at 24.

7

Finally, the administrative law judge rejected Mazzaro's testimony, relying instead on both SSR 96-9p and section 204.00 of the Grid to find the plaintiff not disabled. *See id*. at 24-25. He reasoned:

> The [plaintiff's] ability to perform work at all exertional levels has not been compromised significantly by nonexertional limitations. A finding of "not disabled" is therefore appropriate under the framework of section 204.00 in the [Grid]. Section 204.00 states that an absence of exertional limitations denotes a "substantial work capability for jobs in the national economy at all skill and physical demand levels" and "generally is sufficient for a finding of not disabled. . . ." Furthermore, the conclusion that the [plaintiff] is not disabled is supported by Social Security Ruling 96-9p. While that ruling deals with situations in which the [RFC] is for less than the full range of sedentary work, and this [plaintiff] has no exertional limitations, SSR 96-9p affirms that the ability to hear and understand simple oral instructions or to communicate simple information is sufficient to meet the demands of unskilled work and would not result in a significant erosion of the unskilled sedentary occupational base. Thus, the vocational expert's testimony that the [plaintiff's] communicative limitation does significantly erode the occupational base available to her is not adopted because it is inconsistent with both section 204.00 of Appendix 2 and SSR 96-9p.

*Id*. at 25. Section 204.00 states, in relevant part:

> The [RFC] to perform heavy work or very heavy work includes the functional capability for work at the lesser functional levels as well, and represents substantial work capability for jobs in the national economy at all skill and physical demand levels. Individuals who retain the functional capacity to perform heavy work (or very heavy work) ordinarily will not have a severe impairment or will be able to do their past work – either of which would have already provided a basis for a decision of "not disabled." . . . [A]n impairment which does not preclude heavy work (or very heavy work) would not ordinarily be the primary reason for unemployment, and generally is sufficient for a finding of not disabled, even though age, education, and skill level of prior work experience may be considered adverse.

Appendix 2 to Grid, § 204.00.

Use of the Grid is appropriate when a rule accurately describes an individual's capabilities and vocational profile. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 462 & n.5 (1983). When a claimant's impairments involve only limitations related to the exertional requirements of work, the Grid provides a "streamlined" method by which the commissioner can

8

meet his burden of showing that there is other work a claimant can perform. *See, e.g., Heggarty v. Sullivan*, 947 F.2d 990, 995 (1st Cir. 1991).  However, in cases in which a claimant suffers from nonexertional as well as exertional impairments, the Grid may not accurately reflect the availability of other work he or she can do. *See, e.g., id.* at 996; *Ortiz v. Secretary of Health & Human Servs.*, 890 F.2d 520, 524 (1st Cir. 1989).  Whether the commissioner may rely on the Grid in these circumstances depends on whether a nonexertional impairment "significantly affects [a] claimant's ability to perform the full range of jobs" at the appropriate exertional level. *Id.* (citation and internal quotation marks omitted).  If a nonexertional impairment is significant, the commissioner generally may not rely on the Grid to meet his Step 5 burden but must employ other means, typically use of a vocational expert. *See, e.g., id.*

Even in cases in which a nonexertional impairment is determined to be significant, however, the commissioner may yet rely exclusively upon the Grid if "a non-strength impairment . . . has the effect only of reducing that occupational base marginally[.]" *Id*. "[A]though a nonexertional impairment can have a negligible effect, ordinarily the ALJ must back such a finding of negligible effect with the evidence to substantiate it, unless the matter is self-evident." *Seavey v. Barnhart,* 276 F.3d 1, 7 (1st Cir. 2001) (citation and internal quotation marks omitted).

As the plaintiff argues, *see* Statement of Errors at 5-6, 9-11, the findings that she retained the ability to hear simple instructions, and that her hearing impairment did not substantially erode the base of either heavy to very heavy, or sedentary, occupational work available to her are not supported by substantial evidence.

At hearing, the plaintiff's counsel conceded that his client retained the ability to hear and understand simple oral instructions, but only in most office-type environments in which there is

not a lot of noise. *See* Record at 39. Audiology testing revealed that the plaintiff is unable to hear/distinguish speech at normal conversation levels, let alone with louder than normal background noise. *See id*. at 479. The administrative law judge evidently assumed that this testing was performed *without* the benefit of hearing aids; however, it is not clear that this is so, *see id.*, and the plaintiff's testimony, as well as other record evidence including the observations of the Social Security intake worker, indicate otherwise.[5] The intake worker observed that the plaintiff could not understand all that was said to her and relied in part on assistance from her case worker, *see id*. at 200, and the plaintiff testified that she cannot hear a speaker at all if there are other people in the room, even if she is facing that person, *see id*. at 37. The plaintiff indicated that she can overcome this difficulty by reading lips if facing a person. *See id*. However, there is no evidence that sedentary jobs, or for that matter, jobs generally, are sufficiently quiet to permit an individual with this level of hearing deficit to hear simple instructions or, alternatively, would permit sufficient accommodation of such a person's need to face a speaker to read lips. Even assuming, as the administrative law judge found, *see id*. at 23-24, that the plaintiff could communicate with no observable difficulty in visits to doctor's offices or at her disability hearing, those environments do not necessarily replicate a work environment. Further, both Dr. Tingley and Mazzaro indicated that the plaintiff's hearing impairment would, in fact, pose difficulties in the workplace. *See id*. at 54-55, 59-60.

As counsel for the commissioner acknowledged at oral argument, the administrative law judge's reliance on section 204.00 of the Grid, which pertains to claimants capable of performing work at heavy to very heavy exertional levels, was misplaced. In relying on SSR 96-9p, the

---

[5] At oral argument, I questioned counsel for the plaintiff and counsel for the commissioner as to whether they interpreted the 2009 audiology testing results as reflecting the plaintiff's hearing while wearing her hearing aids. Both said that they did.

administrative law judge implicitly conceded that the plaintiff's hearing loss would in fact substantially erode the occupational base for all but sedentary work.

Counsel for the commissioner argued that a different provision of the Grid, section 201.00(i), nonetheless supports the decision. Yet, pursuant to the rule of *SEC v. Chenery Corp.*, 332 U.S. 194 (1947), "a reviewing court cannot affirm an agency's decision on the basis of a *post hoc* rationalization but must affirm, if at all, on the basis of a rationale actually articulated by the agency decision-maker." *Clark v. Astrue*, Civil No. 09-390-P-H, 2010 WL 2924237, at *3 (D. Me. July 19, 2010) (rec. dec., *aff'd* Aug. 9, 2010). "[A]n exception to the *Chenery* rule exists when a remand will amount to no more than an empty exercise because, for example, application of the correct legal standard could lead to only one conclusion[.]" *Id*. at *4 (citation and internal quotation marks omitted). Nonetheless, that exception does not apply here. Section 201.00(i) indicates that "illiteracy or the inability to communicate in English" does not significantly erode the full occupational base for unskilled sedentary work, the primary work functions of which relate to working with things rather than data or people. Appendix 2 to Grid, § 201.00(i). This provision is inapposite. The plaintiff does not suffer from illiteracy or an inability to communicate in English, but rather from a hearing loss.

To the extent that the administrative law judge relied at Step 5 on SSR 96-9p, his reliance on that authority was misplaced, as well. First, as discussed above, he found, in the absence of substantial evidence, that the plaintiff retained the ability to hear simple oral instructions. Second, as the plaintiff observes, *see* Statement of Errors at 10-11, he ignored a pertinent section of SSR 96-9p that provides:

> Since all work environments entail some level of noise, restrictions on the ability to work in a noisy workplace must be evaluated on an individual basis. The unskilled sedentary occupational base may or may not be significantly eroded

11

> depending on the facts in the case record. In such cases, it may be especially useful to consult a vocational resource.

SSR 96-9p at 160.

Dr. Trumbull, whose RFC opinion the administrative law judge purported to adopt, *see* Record at 24, did find a restriction against high background noise, *see id*. at 484, which the administrative law judge failed to include either in his hypothetical question to Mazzaro or in his ultimate RFC finding, *see id*. at 58-59; Finding 5, *id*. at 21. Even in the absence of such a restriction, Mazzaro testified that the described hearing impairment would substantially erode the full range of available sedentary work.

At oral argument, counsel for the commissioner suggested that any error with respect to SSR 96-9p was, in effect, harmless because Social Security Ruling 85-15 ("SSR 85-15") clarifies that an environmental restriction against high background noise does not substantially erode the full base of work at all exertional levels. SSR 85-15 does state, under the heading "Environmental Restrictions": "Where a person has a medical restriction to avoid excessive amounts of noise, dust, etc., the impact on the broad world of work would be minimal because most job environments do not involve great noise, amounts of dust, etc." SSR 85-15, reprinted in *West's Social Security Reporting Service,* Rulings 1983-1991, at 351.

Yet, Dr. Chamberlin did not classify the plaintiff's restriction as environmental but, rather, communicative. *See* Record at 484. The distinction is material because SSR 85-15 states, under the heading "Hearing Impairments":

> Communication is an important factor in work. The inability to hear, because it vitally affects communication, is thus of great importance. However, hearing impairments do not necessarily prevent communication, and differences in types of work may be compatible with various degrees of hearing loss. Occupations involving loud noise, such as in printing, have traditionally attracted persons with hearing impairments, whereas individuals with normal hearing have to wear ear protectors to be able to tolerate the working conditions. On the other hand,

>occupations such as bus driver require good hearing. There are so many possible medical variables of hearing loss that consultation of vocational reference materials or the assistance of a VS [vocational specialist] is often necessary to decide the effect on the broad world of work.

*Id*. This passage of SSR 85-15, like the portion of SSR 96-9p cited by the plaintiff, indicates that the capacity to hear is sufficiently important to the capacity to work that vocational expert testimony may be required to determine the effect of a particular hearing impairment on the availability of work. Because SSR 85-15 cannot fairly be read to direct that the plaintiff would be found non-disabled on remand, its *post hoc* invocation runs afoul of the *Chenery* rule.

In short, no substantial evidence supported the administrative law judge's findings that the plaintiff possessed an unrestricted ability to hear simple instructions or that her hearing impairment did not significantly erode the occupational base for sedentary (or any other) type of work. Thus, he impermissibly relied solely on the Grid to find her not disabled, warranting reversal and remand.

### B. Mental Impairments

The record contains four expert assessments of the impact of the plaintiff's mental impairments on her functional capacity. DDS nonexamining consultant Lewis F. Lester, Ph.D., found, in a Psychiatric Review Technique Form ("PRTF") dated July 30, 2009, that the plaintiff's mental impairments caused a mild restriction in her activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation, each of extended duration. *See id*. at 470. In an accompanying mental RFC report of the same date, he indicated that the plaintiff nonetheless could understand and remember simple, repetitive tasks and procedures; could be reliable and sustain two-hour blocks at simple tasks at a consistent pace over a normal work day

and week; could not interact with the public but could interact with co-workers and supervisors in a normal work setting; and could adapt to occasional and routine changes. *See id*. at 476.

Dr. Parent, the plaintiff's treating psychiatrist, stated in a mental impairment questionnaire dated November 28, 2009, amended on January 5, 2010, that the plaintiff's mental impairments caused no more than a mild restriction in activities of daily living as of November 28, 2009, but moderate as of January 5, 2010, moderate difficulties in maintaining social functioning, and extreme deficiencies of concentration, persistence, or pace, with three to four or more episodes of decompensation, each of at least two weeks' duration. *See id*. at 493. She found, *inter alia*, that the plaintiff was unable to meet competitive standards with respect to her ability to maintain attention for two-hour segments or complete a normal work day or work week without interruptions from psychologically based symptoms, and seriously limited in her ability to get along with co-workers and peers without unduly distracting them or exhibiting behavioral extremes. *See id*. at 491.

DDS nonexamining consultant Brian Stahl, Ph.D., indicated, in a PRTF dated March 4, 2010, that the plaintiff had no severe mental impairment as of the date of the report. *See id*. at 623, 635.

Finally, Dr. Tingley testified, at the plaintiff's hearing on June 22, 2011, that she could understand, remember, and carry out simple instructions, could use judgment in making simple work-related decisions, could respond appropriately to co-workers and supervisors in usual work situations, with accommodation for her hearing impairment, and could adapt to changes in an ordinary work setting. *See id*. at 54-55. He disagreed with Dr. Parent's assessment of the degree of impact on the plaintiff's attention and concentration, stating that her ADHD was treatable and had, in fact, been treated with some improvement. *See id*. at 55-56. He acknowledged, on cross-

examination by the plaintiff's counsel, that the plaintiff might have occasional interruptions in her work schedule and performance based on symptoms related to her ADHD and mood disorder. *See id*. at 58. However, he had earlier testified that the plaintiff could complete a normal work day and work week without interruptions from her psychologically based symptoms, with accommodations related to her hearing impairment. *See id*. at 56.

In his decision, the administrative law judge found that the plaintiff had only mild restriction in her activities of daily living, moderate difficulties in social functioning and in concentration, persistence, or pace, and no episodes of decompensation of extended duration. *See id*. at 20. He explained:

> [T]he [plaintiff] is able to take care of herself, her household chores, and her two children, ages five and seven. Records dated April 2008 from Kennebec Behavioral Health [KBH] show that the [plaintiff] reported she was doing "alright," which included being able to perform activities such as getting her son ready for school, attending to daily housework, and looking for a job. Although the [plaintiff] testified that she receives help with child care on an almost daily basis from her mother and aunt, that assertion is not supported by the documentary record. KBH and primary care records do not reflect chronic, significant difficulties with the [plaintiff's] ability to interact, frequently referring to her as pleasant, calm and cooperative. These records also do not document serious problems with the [plaintiff's] ability to maintain concentration, persistence or pace. KBH records dated March and May 2010 indicate that the [plaintiff] said her focus and concentration were "adequate," and in March 2011 she reported that she was able to complete a puzzle. The [plaintiff] has not required any hospitalization due to mental distress since the alleged onset date. She was admitted to a residential crisis unit for three days in August 2007; however, her global functioning level was estimated at that time to be 60, which denotes a moderate, and nearly mild degree of impairment. Dr. Tingley testified that the evidence shows that the [plaintiff] is no more than mildly to moderately impaired in the functional areas shown above.

*Id*. at 20-21 (citations omitted).

The administrative law judge gave no weight to Dr. Parent's opinion on the basis that it was inconsistent with substantial medical evidence, including her own observations of the plaintiff. *See id*. at 24. He gave considerable weight to Dr. Lester's opinion that the plaintiff

was mildly to moderately impaired in her ability to meet the demands of non-detailed work, which he found consistent with the overall evidence, and little weight to Dr. Stahl's assessment that the plaintiff had no severe mental impairment. *See id*.

The plaintiff faults the administrative law judge for (i) drawing a negative inference as to the credibility of her mental health complaints based on the fact that she was looking for work, *see* Statement of Errors at 6, (ii) erroneously according the Parent opinion no weight, *see id*. at 7-9, and (iii) failing to take into consideration, at Step 5, her documented issues with irritability and concentration, *see id*. at 11. With respect to the latter point, the plaintiff's counsel underscored, at oral argument, that the administrative law judge had ignored that portion of Dr. Tingley's testimony indicating that his client's mental impairments would cause occasional difficulties focusing and concentrating.

The plaintiff cites no authority for the proposition that it is impermissible for an administrative law judge to take into account a claimant's efforts to find work in assessing his or her credibility. However, even assuming *arguendo* that the administrative law judge erred in so doing, any error was harmless. He supplied a number of reasons why he found the plaintiff more capable than she claimed, including the range of her activities of daily living, gaps in her mental health treatment, and a lack of indication in treating source notes, including those of Dr. Parent, that she had serious difficulties in mood regulation or her ability to maintain concentration, persistence, or pace. *See, e.g., id*. at 20-23. Moreover, the administrative law judge's mental RFC determination was supported by the opinions of both Drs. Lester and Tingley. *Compare* Finding 5, *id*. at 21 *with id*. at 54-55, 476. As counsel for the commissioner contended at oral argument, the testimony of Dr. Tingley on which the plaintiff relies was equivocal. Dr. Tingley merely acknowledged that the plaintiff might have occasional interruptions in her work schedule

and performance attributable to her mental impairments. *See id*. at 58. That testimony was not necessarily inconsistent with his earlier, unequivocal testimony that the plaintiff could complete a normal work day and work week without interruptions from her psychologically based symptoms. *See id*. at 56.

The plaintiff assails the administrative law judge's handling of the Parent opinion on two bases: that he (i) relied too heavily on the opinions of state agency evaluators while entirely disregarding the opinion of a treating source, whose opinion was entitled to at least some weight, and (ii) focused on progress notes indicating that she was doing well or that her condition had improved, while ignoring notes showing deterioration in her mental state and functioning. *See* Statement of Errors at 7-9.

The plaintiff cites no authority holding that a treating source's opinion must be given at least some weight. Had the Parent opinion been "well-supported by medically acceptable clinical and laboratory diagnostic techniques and . . . not inconsistent with the other substantial evidence in [the plaintiff's] case record," the administrative law judge would have been obliged to give it controlling weight, to the extent that it bore on the nature and severity of the plaintiff's impairments. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

However, once the administrative law judge determined that the opinion was not entitled to controlling weight, he had discretion to reject it, provided that he supplied "good reasons" for so doing. *See, e.g.,* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) ("[The commissioner] will always give good reasons in [his] notice of determination or decision for the weight [he] give[s] [a claimant's] treating source's opinion."); Social Security Ruling 96-5p, reprinted in *West's Social Security Reporting Service* Rulings 1983-1991 (Supp. 2012) ("SSR 96-5p"), at 127 (even as to issues reserved to the commissioner, "the notice of the determination or decision must

17

explain the consideration given to the treating source's opinion(s)"); Social Security Ruling 96-8p, reprinted in *West's Social Security Reporting Service* Rulings 1983-1991 (Supp. 2012) ("SSR 96-8p"), at 150 (an administrative law judge can reject a treating source's opinion as to RFC but "must explain why the opinion was not adopted").[6]

The administrative law judge also had discretion to resolve conflicts among expert opinions by according great weight to the opinion of a state agency physician. *See, e.g., Shaw v. Secretary of Health & Human Servs.*, No. 93-2173, 1994 WL 251000, at *4 (1st Cir. June 9, 1994) ("The regulations do not require a particular view of the evidence, but leave ambiguities and inconsistencies to be sifted and weighed by the ALJ, who may, as here, use a consultative examination to help resolve uncertainties. The ALJ must evaluate all medical opinions from all sources in light of a non-exclusive list of possibly relevant factors. While generic deference is reserved for treating source opinions, the regulations also presuppose that nontreating, nonexamining sources may override treating doctor opinions, provided there is support for the result in the record.") (citations omitted); *Rodriguez*, 647 F.2d at 222 ("The Secretary may (and, under his regulations, must) take medical evidence. But the resolution of conflicts in the evidence and the determination of the ultimate question of disability is for him, not for the doctors or for the courts.").

The administrative law judge supportably determined that the Parent opinion was inconsistent with Dr. Parent's own notes, which tend to show that, although the plaintiff had

---

[6] Treating source opinions are evaluated based on several enumerated factors: (i) length of the treatment relationship and frequency of examination, (ii) nature and extent of the treatment relationship, (iii) supportability — *i.e.,* adequacy of explanation for the opinion, (iv) consistency with the record as a whole, (v) whether the treating physician is offering an opinion on a medical issue related to his or her specialty, and (vi) other factors highlighted by the claimant or others. *See* 20 C.F.R. §§ 404.1527(d)(2)-(6), 416.927(d)(2)-(6).

setbacks during times when her medications were adjusted because of side effects and/or she encountered situational stressors, her mental impairments on the whole imposed only mild to moderate restrictions on her functioning.[7]

For these reasons, the administrative law judge did not err in rejecting the Parent opinion, and his assessment of the plaintiff's mental RFC is supported by substantial evidence.

## II. Conclusion

For the foregoing reasons, I recommend that the decision of the commissioner be **VACATED** and the case **REMANDED** for further proceedings consistent herewith.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum*

---

[7] Dr. Parent's progress notes for the most recent period of record, from January 13, 2011, to March 29, 2011, exemplify this pattern. On January 13, 2011, the plaintiff reported to Dr. Parent that she was less stressed, no longer depressed, much less irritable, and calmer, with adequate energy and motivation. *See* Record at 694. No abnormalities were noted on a mental status examination; for example, Dr. Parent found the plaintiff to be "neatly dressed, appropriately for the season and well groomed" and "pleasant, calm, and cooperative" with a "'pretty good'" mood, a fully expressive affect, and "logical and goal-directed" thoughts. *Id*. Dr. Parent assessed the plaintiff as "stabilized with current medication." *Id*. However, at the next visit on February 9, 2011, the plaintiff reported that she was "'back to square one[,]'" was having difficulty sleeping, and was "more irritable, slightly depressed and [having] difficulty concentrating" and was unable to sit and do a puzzle. *Id*. at 689. Even then, Dr. Parent recorded a seemingly normal mental status examination but for her notation that the plaintiff's mood was "'more irritable.'" *Id*. at 690. She concluded that the plaintiff had "developed an exacerbation of a mixed mood state," most likely because she had increased her salt intake, which was interfering with her lithium level. *Id*. The plaintiff reported at her next visit on March 1, 2011, that she was "feeling much better since starting" a new medication, Saphris. *Id*. at 683. She was sleeping better, had "adequate concentration and focus and [could] now sit and do a puzzle" and had good energy and motivation. *Id*. Dr. Parent noted no abnormalities on mental status examination and concluded that the plaintiff had "stabilized since regulating her salt intake and adding Saphris[.]" *Id*. at 694. As of her next visit on March 29, 2011, the plaintiff reported that she had "remained stable[.]" *Id*. at 679. She denied any major mood changes and reported that she had "handled stressors, including her truck dying, without falling apart or 'flipping out.'" *Id*. She stated that she felt more calm and focused since taking Saphris. *See id*. Dr. Parent noted no abnormalities on mental status examination and concluded that the plaintiff had stabilized and continued to do well on her current medications. *See id*. at 680. Throughout this period, Dr. Parent found on mental status examination that the plaintiff's memory and concentration were intact. *See id*. at 680, 684, 690, 696.

*and request for oral argument before the district judge, if any is sought, within fourteen (14) days after being served with a copy thereof.   A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to <u>de</u> <u>novo</u> review by the district court and to appeal the district court's order.*

Dated this 30th day of December, 2012.

/s/  John H. Rich III
John H. Rich III
United States Magistrate Judge